***********
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as facts and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner and in a Pre-Trial Agreement dated August 25, 2000 as:
 STIPULATIONS
1. Plaintiff is Ruth Patricia Suttles.
2. Defendant is Southeastern Health Facilities, d/b/a Mountain View Manor.
3. At all times relevant hereto, the employment relationship existed between plaintiff and defendant.
4. At all times relevant hereto, the parties were and are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
5. Defendant is self-insured and Key Risk Management Services is the servicing agent with respect to the injury by accident of 28 November 1998.
6. Plaintiff's average weekly wage was $326.62, which yields a compensation rate of $217.75.
 ***********
Based upon the competent, credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born on 25 April 1950. She has a G.E.D. and certification as a nursing assistant (CNA). Plaintiff had previously worked for defendant Mountain View Manor about a year before, but had not worked anywhere for the six to twelve month period before she was rehired by defendant as a CNA in November 1998.
2. Plaintiff testified that after working for defendant for eight days in November 1998, she sustained an injury by accident and by a specific traumatic incident on 28 November 1998. At this time, she was working 12-hour shifts from 7 p.m. to 7 a.m. Plaintiff testified that on 28 November 1998, she was attempting to reposition a patient in the bed when she felt a sharp pain in her right lower back. Plaintiff also testified that later during that same shift, she injured her right ankle while emptying a linen buggy. The buggy struck her right ankle.
3. Plaintiff did not report any injuries to the charge nurse before she left work on 28 November 1998. The next day, plaintiff called in and advised Christy Cable, her supervising nurse, that she would not be in to work because her back was hurting. Plaintiff's Exhibit 1 is a letter that plaintiff wrote, apparently on 1 December 1998, explaining the circumstances of her accident. The letter says in pertinent part that "I pulled something in the lower part of my back when trying to lift Matrian Gregg over in her bed. . . . Also my right ankle I hit on the soiled linen barrel when emptying it at the end of shift. It is swollen up and hurting bad. I saw Dr. Crider Monday. He said he would be happy to speak with you if need be." Plaintiff requested her daughter to hand-deliver this note to defendant on or about that same date.
4. Plaintiff had pre-existing problems with her right ankle. In 1985, plaintiff sustained a fracture to her right ankle, which was repaired with pins and screws. Subsequent to that time, she developed arthritis in her right ankle. As noted in her medical records, this ankle injury had caused plaintiff problems before when she worked and stayed on her feet for prolonged periods of time. She had been seen at Harris Regional Hospital on 23 May 1996, with complaints that working 12-hour shifts and being on her feet for 3 to 4 hours at a time was causing pain in her right ankle and her right knee.
5. Plaintiff first sought medical treatment for her back and right ankle injuries of 28 November 1998 with Dr. Steven S. Crider, a general practitioner in Sylva, on 30 November 1998. Dr. Crider's notes of the visit indicate that plaintiff complained of a week-long history of intermittent right ankle pain with swelling and right lower back pain, which had gotten intense and made it difficult for her to do her job. Dr. Crider testified that he recalled plaintiff talking about a cart she was pushing going up against her ankle. Further, when shown plaintiff's Exhibit 1 and the description therein of plaintiff's injuries by accident, Dr. Crider testified that it was consistent with his recall of his discussion with plaintiff when she presented to him on 30 November 1998.
6. Dr. Crider noted a subcutaneous bursa which was fluid filled and an old scar on the right ankle. He assessed plaintiff with right ankle arthralgia secondary to fracture/post-traumatic arthritis and right paraspinal muscle spasms/lower back pain. Dr. Crider recommended that plaintiff rest but not in bed, and took plaintiff out of work from 28 November 1998 through 9 December 1998. He also referred her to Dr. James H. Lipsey, an orthopedic surgeon.
7. Plaintiff presented to Dr. Lipsey on 9 December 1998. On the health information form she filled out upon arrival, plaintiff describes both incidents at work in which she was injured and gives the date of injury as 11-28-98. On examination of her ankle, Dr. Lipsey found some minimal puffiness, which plaintiff indicated was there prior to her injury. Dr. Lipsey also noted a full range of motion of the ankle, with no indication of an acute injury. He assessed a contusion to the right ankle and a lumbrosacral sprain. Dr. Lipsey placed her on partial bed rest and told her to avoid doing housework.
8. Plaintiff next reported to Dr. Lipsey on 15 December 1998, complaining of soreness in her back without radiation into her legs. Dr. Lipsey noted minor tenderness in her lower back and ordered x-rays of her lumbar spine, which showed no bone or joint abnormality. He took plaintiff out of work until 15 January 1998.
9. On 27 January 1999, plaintiff returned to Dr. Lipsey, reporting only occasional soreness in her back. Dr. Lipsey noted that her back showed no local tenderness, and found that she had a range of motion consistent with her age and habitus. Dr. Lipsey found that she had completely recovered from her lumbrosacral sprain, with no permanent impairment, and assigned a zero percent permanent partial disability. He released her from his care with no work restrictions, although he did caution her on lifting.
10. After learning about Dr. Lipsey's full duty release, Kathy Simonds, a nursing director for Mountain View Manor, offered plaintiff employment in her former position. Ms. Simonds placed plaintiff on the work schedule shortly thereafter and called her to confirm her attendance. Plaintiff replied that she would report for work; however, she did not show up for work. Instead, she never returned to work for Mountain View Manor. Ms. Simonds kept plaintiff on the schedule for three more days before removing her due to her continued failure to report for work.
11. Thereafter, plaintiff did not seek medical treatment for her back for nearly nine months. She cancelled appointments or did not show up for at least three appointments with Dr. Lipsey in March and April 1999.
12. On 23 September 1999, Dr. Crider refilled a prescription of Ultram. This was the first medication he had prescribed for plaintiff since 4 December 1998. On 29 September 1999, plaintiff saw Dr. Crider for complaints of back pain that she related to her work injury. However, on this occasion she complained of pain in the left lower back and left leg, whereas her prior complaints related to the right lower back.
13. Plaintiff was then examined by Dr. Lipsey on 15 October 1999. At this visit, she reported that she had been doing well with only minor discomfort since her last visit, which was nine months earlier, when she developed pain in her left lower back and left leg without any intervening trauma. Plaintiff also reported aggravation of this pain with motion of her neck. Plaintiff returned to Dr. Lipsey on 25 October and 10 November 1999, continuing to complain of pain radiating into her left lower leg. Dr. Lipsey ordered an MRI of the lumbar spine. Although his notes indicate plaintiff was to return to see him, it appears that she did not.
14. On 28 April 2000, plaintiff was seen by Dr. Loomis of Mountain Neurological Center. It appears that the MRI ordered by Dr. Lipsey had not yet been done, and Dr. Loomis also ordered a lumbar MRI. The MRI was done on 30 May 1999, and revealed a mild disc protrusion at L5-S1 that was not thought to be significant. After reviewing the MRI results, Dr. Loomis determined that the mild bulge at L5-S1 was not impinging upon any nerve roots. He did not recommend surgery and suggested physical therapy. He referred plaintiff back to Dr. Crider for follow-up.
15. Following her release from Dr. Loomis, plaintiff continued to see Dr. Crider with various complaints. She was seen on 19 June 2000, for idiopathic vertigo and low back pain. She was then seen on 1 August 2000, for complaints of two weeks of toe pain, at which time plaintiff made no mention of back pain. At that time Dr. Crider noted that plaintiff was not in acute distress, and had a "very puzzling presentation."
16. On 21 August 2000, plaintiff saw Dr. Crider with complaints of muscle cramps, particularly in her thighs and left forearm. During that visit, she discussed with Dr. Crider difficulties in her home life with her husband, which made her nervous and scared all the time. She reported that her disabled husband who was also a recovering alcoholic, constantly made messes, which she had to clean up. She also related headaches, sometimes accompanied by nausea. Dr. Crider concluded that her pains were related to stress and underlying osteoarthritis. Dr. Crider saw her again on 28 September 2000, for stress-related headaches, anxiety, arthritic pain and low back pain.
17. Plaintiff suffered injuries by accident which arose out of and in the course of her employment when she strained her back while lifting a patient at work and when a laundry cart hit her right ankle on 28 November 1998.
18. Plaintiff was released to return to work without restrictions on 27 January 1999. Although defendant had work available, plaintiff did not return to work and refused the offer of suitable employment. Plaintiff's disability from her work-related injuries ended on 27 January 1999. Aside from one weekend of CNA work, plaintiff has not sought work of any kind since 27 January 1999, and has not conducted a reasonable job search for suitable work.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff suffered injuries by accident which arose out of and in the course of her employment when she strained her back while lifting a patient at work and when a laundry cart hit her right ankle on 28 November 1998. N.C. Gen. Stat. § 97-(2).
2. As a result of the injuries sustained by plaintiff on 28 November 1998, plaintiff was totally disabled from work from 29 November 1998 through 27 January 1999 when she was released to return to work without restriction and with a zero permanent partial disability rating by Dr. Lipsey. Plaintiff has failed to show that she continued to be disabled following her release, and suitable employment was offered to her by defendant which plaintiff refused. N.C. Gen. Stat. §§ 97-29, 97-32.Hilliard v. Apex Cabinet Co., 54 N.C. App. 173, 282 S.E.2d 828 (1981),rev'd on other grounds, 305 N.C. 593, 290 S.E.2d 682 (1982).
3. Plaintiff is entitled to have defendant pay for all medical treatment she received related to her compensable injuries between 28 November 1998 and 27 January 1999 when she was released without restrictions. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay to plaintiff temporary total disability compensation in the amount of $217.75 per week from 29 November 1998 through 27 January 1999. Said amount shall be paid in a lump sum subject to attorney's fees approved below.
2. Defendant shall pay for all treatment plaintiff received related to her compensable injuries from 28 November 1998 through the date of plaintiff's release on 27 January 1999.
3. An attorney fee constituting 25% of the lump award ordered in Paragraph 1 is hereby approved for plaintiff's counsel and shall be paid by defendant directly to plaintiff's counsel.
4. Defendants shall pay the costs.
This the ___ day of December, 2001.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER